******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BERNADINE BROOKS, ADMINISTRATRIX
(ESTATE OF ELSIE WHITE) *v.* ROBERT
POWERS ET AL.
(AC 37301)

Gruendel, Mullins and Mihalakos, Js.*

*Argued December 2, 2015—officially released April 26, 2016*

(Appeal from Superior Court, judicial district of
Middlesex, Domnarski, J.)

*Daniel P. Scholfield*, with whom, on the brief, were
*Steven J. Errante* and *Marisa A. Bellair*, for the appellant (plaintiff).

*Thomas R. Gerarde*, with whom was *Emily Holland*,
for the appellees (named defendant et al.).

*James N. Tallberg* and *Dennis M. Durao* filed a brief
for the appellee (defendant town of Westbrook).

*Opinion*

GRUENDEL, J. The plaintiff, Bernadine Brooks, administratrix of the estate of Elsie White, appeals from the rendering of summary judgment against her on her claims that the defendants, Constables Robert Powers and Rhea Milardo,[1] were negligent in responding to a report that there was a woman, in a field near the ocean during a severe storm, who needed medical attention. No one attended to White, and the next morning her body washed up on the shore. The court held, as a matter of law, that the plaintiff's claims were barred by discretionary act immunity and that the imminent harm, identifiable victim exception to that immunity did not apply.

On appeal, the plaintiff argues that the court erred in granting the defendants' summary judgment motion and thus barring her claims as a matter of law because the evidence she submitted in response to the defendants' motion permitted a jury reasonably to conclude that the imminent harm, identifiable victim exception did apply, making summary judgment improper.[2] We agree with the plaintiff. The imminent harm, identifiable victim exception has three elements: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." (Internal quotation marks omitted.) *Haynes* v. *Middletown*, 314 Conn. 303, 313, 101 A.3d 249 (2014). Here, the evidence submitted in response to the defendants' summary judgment motion would permit a jury reasonably to find that the defendants were told that White was in a field near the ocean during a severe storm, that they were told she needed medical attention, and that it was apparent that if the defendants isolated her from any chance of aid— by reporting the situation to dispatch in such a way that it would be thought a joke and then driving off without helping her—they would likely subject her to imminent harm from the coastal storm. Because those facts would permit a jury reasonably to conclude that all three elements of the imminent harm, identifiable victim exception were met, summary judgment was improper. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings.

I

The parties submitted numerous deposition transcripts, police reports, and other exhibits in support of and in opposition to the motion for summary judgment. Viewed in the light most favorable to the plaintiff as the party opposing summary judgment, that evidence would permit the following findings of fact. At roughly 6 p.m. on June 18, 2008, a storm rolled into the coastal town of Westbrook (town). Powers testified at the internal affairs investigation into his conduct, the transcript of which the plaintiff included in her opposition to the

defendants' motion for summary judgment, that "[i]t was . . . a dark and stormy night. . . . Very, very dark and very stormy."

The defendants were scheduled for boat patrol that evening from 6 p.m. until 10 p.m. By the time they arrived for work, however, the weather was already severe. The thunderstorm brought with it both torrential downpours and lightning. Due to the storm, the defendants were unable to take the boat out onto the water for the regular boat patrol and were not required to work that night. If they did work, they were to patrol the marinas and other parts of town, ensure that the boat was ready to go out if necessary, and respond to any emergencies that arose.

When the defendants arrived for work, they punched in, got into a cruiser, and drove to Dunkin' Donuts. After that, they drove to the marina to inspect the boat. Milardo testified at her deposition that "the main concern [was] that the bilge pumps were operating properly." Powers testified at his deposition that they did not need to get out of the car to inspect the boat: "[w]e would just look to make sure that the boat was still there and check the pumps. I don't know." Milardo testified at her deposition that she and Powers "just sat in the parking lot and could see that the water was being discharged from the back of the boat through the bilge pumps." The bilge pumps were brand new.

Once they completed their inspection, the defendants drove to a JoJo's Food Mart on Route 1. Powers stayed with the cruiser while Milardo went in to get some snacks. At this time, the town tax collector drove up to the food mart. She appeared concerned and told Powers that there was a woman who needed medical attention in a field just up the road. She said that the woman was wearing a shirt and pants, without a coat or any other rain gear, and was standing with her hands raised to the sky. At that time, it was raining heavily and there was thunder and lightning. The field was about one-half mile from the ocean and less than one-half mile from the food mart.

Powers told the tax collector that he would take care of the situation, and she drove away under the impression that she no longer needed to call 911 because the constable was going to take care of it. Powers then called the 911 dispatcher and told her that "a person stopped by and they said there's a lady up on Route 1 up by Ambleside [Apartments] . . . standing in a field with a raincoat on, looking up at the sky." While Powers and the dispatcher chuckled over this, he told the dispatcher that "[t]hey think she might need medical help," to which the dispatcher replied, "[g]eez, do you think?" Powers asked the dispatcher to send "Rizzo or one of [the other constables]," explaining that "I can't leave the boat." The dispatcher asked where the person was, and Powers said that she was in a field on the side

of Route 1 near Ambleside Apartments. "She should be the person standing out in the rain," he said, chuckling, before saying goodbye.[3]

The dispatcher never sent anyone to the field. She testified at her deposition: "I didn't put [Powers' 911 call] in the computer like I normally do. I didn't write it down to remind me to send someone." She testified that she simply "forgot."

After speaking with the dispatcher, the defendants drove back to the marina to check the boat again. They did not get out of the car, but looked at the boat from the car. The bilge pumps were still pumping. Powers testified at his deposition that he knew the pumps were new.

The defendants then heard a call on the police scanner about a baby choking and joined the fire department in responding to that call. A couple of hours later, the defendants drove along Route 1 past the field by Ambleside Apartments out to the town line and then looped back toward the center of town. As they passed the field where the tax collector had seen the woman, they drove more slowly and turned the cruiser's spotlight on. The grass in the field was knee-high. They did not see anyone. Neither constable got out of the car. Powers testified at the internal affairs investigation into his conduct, the transcript of which the plaintiff included in her opposition to the defendants' motion for summary judgment, that, "[n]o. I wouldn't go out and walk through a field in the pouring rain." When asked if the defendants could have gotten out to do a more thorough sweep of the area, since the woman "could have fallen down or something," Powers replied: "[c]ould have gone home. Could have gone for a walk. Could have."

A former police officer, whom the plaintiff deposed as to the adequacy of the defendants' response, remarked that "the single most important thing that I saw [was] that [the tax collector] clearly told [Powers] that we had a woman that needed medical attention. . . . If you've got somebody that might need [medical attention] or somebody that does need it, you go. Whether it's might or wasn't might, it does not make a difference. The fact that you have somebody that's a human needing something that someone else interprets as medical attention, whether it's might or does, you respond." Powers testified at his deposition that "[i]f a person was in physical danger . . . [he] would respond," but that he did not think the woman in the field presented a "true emergency."

The morning after the storm, on June 19, 2008, a fisherman went out on the water in his boat at about 7 a.m. When he returned from fishing at about 10 a.m., he noticed something washed up among the large rock boulders near the shore just west of his house, less

than one mile from where White was last seen. When the fisherman went to inspect it, he discovered that it was a body floating face down in the water. Police identified the body as White by the CVS pharmacy and Stop & Shop grocery cards attached to a keychain clenched in her fist. The tax collector, who knew White personally, later confirmed that this was the same woman she had seen in the field the night before. White was pronounced dead at 11:01 a.m. The cause of death was accidental drowning.

As to time of death, the police incident report stated that the "investigation did not conclusively pinpoint a time when White entered the water." In the excerpts from the deposition testimony of an investigator for the state medical examiner's office that the defendants submitted, she testified that she observed rigor mortis of the fingers, elbows, and knees, but not of the hips, and no lividity of the body. She did not testify whether that meant White died minutes after the tax collector saw her on the night of June 18, 2008, minutes before the fisherman found her body the next morning, or somewhere in between. The defendants also submitted a single page of transcript from an arbitration hearing at which Ira Kanfer, an associate medical examiner, stated the following:

"Q. So, based on those factors you would estimate the time of death between 7 a.m. and 10 a.m. on the morning of June 19?

"A. Right.

"Q. And you believe that that's consistent with the beginning stages of rigor mortis found by the medical examiner at 12:30?

"A. Yeah."

It is unclear what Kanfer meant by "those factors," and it is unclear, as to the medical evidence, whether it made a time of death between 7 a.m. and 10 a.m. especially likely, or was merely "consistent with" such a time of death.

On January 16, 2010, the plaintiff brought this action against the defendants, alleging that their actions on the night of June 18, 2008, were negligent and caused the death of White. The defendants moved for summary judgment in April, 2014, arguing that, as a matter of law, discretionary act immunity shielded them from any liability. The plaintiff objected, arguing that her claims fell within the imminent harm, identifiable victim exception to that immunity. Both parties submitted exhibits and transcripts in support of their positions. On July 23, 2014, the court held, on the basis of the evidence before it, as a matter of law, that (1) discretionary act immunity applied because the defendants were engaged in the typical functions of police officers; and (2) the imminent harm, identifiable victim exception did not apply because the defendants could not have predicted,

given what they knew, that White would have "drown[ed] in Long Island Sound . . . ." The court thus rendered summary judgment in favor of the defendants. The plaintiff filed a motion for reconsideration, which the court denied. On October 14, 2014, the plaintiff appealed to this court.

## II

The question before us is whether the court properly granted the defendants' motion for summary judgment on the ground that, as a matter of law, discretionary act immunity shielded them from liability, and that the imminent harm, identifiable victim exception to that immunity did not apply.[4] To meet their burden to establish that they were entitled to summary judgment, the defendants needed to prove two things: (1) there was no genuine issue as to the facts establishing that, as a matter of law, their actions were discretionary rather than ministerial, thus triggering discretionary act immunity; and (2) there was no genuine issue as to the facts establishing that, as a matter of law, the plaintiff had failed to meet at least one of the three elements of the exception to that immunity for identifiable victims subject to imminent harm. See Practice Book § 17-49.

The plaintiff concedes that the defendants' actions were not ministerial. She argues, however, that a jury reasonably could conclude from the evidence that all three elements of the exception—(1) imminent harm; (2) identifiable victim; and (3) apparentness—were met because, when the tax collector told Powers that a specific woman out in a field near the ocean during a severe storm needed medical attention, it was apparent that, if the defendants said they would take care of it, but relayed the report to the 911 dispatcher in such a way that she thought it a joke and did not themselves respond, then they isolated the woman from any chance of aid and put her at risk of imminent harm from the coastal storm.

We begin by parsing the requirements of the imminent harm, identifiable victim exception. We conclude, as a general matter, that the exception requires not only that it be apparent that a victim was at risk of imminent harm, but also that it was apparent that the defendants' chosen response or nonresponse to the imminent danger likely would subject the victim to that harm. With that general requirement in mind, we then turn more specifically to the three elements of the exception.

We first conclude that the defendants failed to carry their burden on their motion for summary judgment as to at least two of the three elements—i.e., (2) identifiable victim; and (3) apparentness—because there was evidence from which a jury reasonably could find both that the tax collector identified White with sufficient specificity and that Powers had all the relevant facts before him. We then turn to the final element—(1) immi-

nent harm—and conclude that the defendants failed to carry their burden as to it as well. We begin by laying out the test for whether a harm is imminent. We conclude both that it is the general nature of that harm—not its specific manifestation—that must be imminent; and that a harm is imminent if, on a given day, it is more likely than not to occur. Applying that test to the facts here, we thus ask if a jury reasonably could conclude from the evidence submitted in support of and in opposition to the defendants' summary judgment motion that it was apparent that the joking manner in which Powers called in the emergency to dispatch, together with the defendants' failure to respond themselves, made it more likely than not that White would become a victim of the storm. We hold that a jury reasonably could so conclude. Accordingly, we reverse the summary judgment in favor of the defendants and remand the case for further proceedings.

A

We begin with the standard of review. Because the appropriateness of summary judgment is a question of law, "[o]ur review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 47, 881 A.2d 194 (2005).

"Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Segreto* v. *Bristol*, 71 Conn. App. 844, 848, 804 A.2d 928, cert. denied, 261 Conn. 941, 808 A.2d 1132 (2002). "A material fact . . . [is] a fact which will make a difference in the result of the case." (Internal quotation marks omitted.) *Stuart* v. *Freiberg*, 316 Conn. 809, 821, 116 A.3d 1195 (2015). Accordingly, "[a] defendant's motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact." *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 543, 494 A.2d 555 (1985).

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most

favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . .

"Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed . . . issue [of material fact]. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]." (Internal quotation marks omitted.) *Martel* v. *Metropolitan District Commission*, supra, 275 Conn. 46–47. Likewise, "testimony [that] is too speculative, too conjectural . . . [to support] a judgment for the plaintiff" at trial "cannot serve as a basis for opposition to a motion for summary judgment."[5] (Citations omitted; internal quotation marks omitted.) *Nolan* v. *Borkowski*, 206 Conn. 495, 507, 538 A.2d 1031 (1988).

In sum, the test is "whether [the movant] would be entitled to a directed verdict on the same facts"; (internal quotation marks omitted) *Connell* v. *Colwell*, 214 Conn. 242, 247, 571 A.2d 116 (1990); i.e., whether "a jury could not reasonably and legally have reached any other conclusion." (Internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 856, 37 A.3d 700 (2012). "[A] summary disposition . . . should be on evidence which a jury would not be at liberty to disbelieve . . . ." (Internal quotation marks omitted.) *2830 Whitney Avenue Corp.* v. *Heritage Canal Development Associates, Inc.*, 33 Conn. App. 563, 566, 636 A.2d 1377 (1994). This demanding burden is due to "the well established standards compelling great deference to the historical function of the jury [which] find their roots in the constitutional right to a trial by jury." (Internal quotation marks omitted.) *Curran* v. *Kroll*, supra, 856. Our courts have "give[n] great weight . . . to the plaintiff's constitutional right to have his or her case presented to a jury." Id., 856 n.7.

Here, the defendants moved for summary judgment arguing that they were immune from liability because there was no genuine issue as to the facts establishing that, as a matter of law: (1) their allegedly negligent conduct was discretionary—not ministerial—thus triggering discretionary act immunity; and (2) no exception applied to defeat that immunity.[6] The plaintiff concedes that the defendants' conduct was not ministerial, but argues that the imminent harm, identifiable victim exception to discretionary act immunity applied. We thus briefly review the law of discretionary act immunity and the imminent harm, identifiable victim

exception.

At common law, "a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of [discretionary] acts." (Internal quotation marks omitted.) *Spears* v. *Garcia*, 263 Conn. 22, 36, 818 A.2d 37 (2003); see also *Grady* v. *Somers*, 294 Conn. 324, 337–38, 984 A.2d 684 (2009) (reviewing scope of discretionary act immunity). Even if an act is discretionary, our Supreme Court "has recognized an exception to discretionary act immunity that allows for liability when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . . This identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. . . . All three must be proven in order for the exception to apply." (Internal quotation marks omitted.) *Haynes* v. *Middletown*, supra, 314 Conn. 312–13 (discussing exception in context of derivative claim against municipality). Nevertheless, the exception "has received very limited recognition in this state."[7] (Internal quotation marks omitted.) Id., 319.

"[T]he ultimate determination of whether [discretionary act] immunity applies is ordinarily a question of law for the court . . . [unless] there are unresolved factual issues material to the applicability of the defense . . . [where] resolution of those factual issues is properly left to the jury."[8] (Internal quotation marks omitted.) Id., 313. "We therefore exercise plenary review over the issue of whether the identifiable person-imminent harm exception to governmental immunity applies." *Edgerton* v. *Clinton*, 311 Conn. 217, 227–28, 86 A.3d 437 (2014).

Thus, fitting the substantive law at issue here into the general summary judgment standard, we ask: (1) did the defendant initially put forth evidence that a jury would not be at liberty to disbelieve and from which the only reasonable conclusion was that the plaintiff had failed to establish at least one element of the imminent harm, identifiable victim exception to immunity; and (2) if so, did the plaintiff nonetheless put forth such additional evidence that a jury reasonably could conclude from all the evidence that the plaintiff had established all three elements of the exception? In this case, our analysis begins and ends with the second question.

B

As a threshold matter, we must determine the general contours of the imminent harm, identifiable victim exception. Our Supreme Court has stated that exception in two different ways.

First, the court has said that the exception applies if "the circumstances make it apparent to the public officer that *his or her failure to act would be likely to subject* an identifiable person to imminent harm . . . ." (Emphasis added; internal quotation marks omitted.) *Haynes* v. *Middletown*, supra, 314 Conn. 312. Read literally, this would mean that if it is clear before the officer acts that doing nothing likely would result in harm to the victim, then the exception applies, immunity is turned off, and whatever response or nonresponse the officer makes must be reasonable; a negligent response would subject the officer to liability. On this reading, the exception would operate as an off switch for immunity in a subset of high stakes situations, requiring officers to act reasonably when someone's life was on the line.

Second, the court has said that the exception applies if the plaintiff can show "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that *his or her conduct is likely to subject* that victim to that harm." (Emphasis added; internal quotation marks omitted.) Id., 313. Read literally, this would mean that an officer who has identified a victim as threatened by imminent harm is still free to respond unreasonably, so long as it is not apparent that the officer's particular response will likely result in harm to the victim. On this reading, the exception would generally permit officers to act unreasonably, even in high stakes situations, but would peel back that immunity if an officer showed a particularly egregious disregard for life.

We conclude that our Supreme Court's immunity jurisprudence supports the second reading of the exception. A plaintiff must therefore prove not only that it was apparent that a victim was at risk of imminent harm, but also that it was apparent that the defendants' chosen response or nonresponse to the imminent danger would likely subject the victim to that harm.

We reach this conclusion due to the policy concerns that underlie both discretionary act immunity and the imminent harm, identifiable victim exception.

As to discretionary act immunity, it "reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment

in the performance of ministerial acts." (Internal quotation marks omitted.) *Edgerton* v. *Clinton*, supra, 311 Conn. 229–30.

The rationale behind the imminent harm, identifiable victim exception is similar. It "represents a situation in which the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force." (Internal quotation marks omitted.) *Bonington* v. *Westport*, 297 Conn. 297, 307, 999 A.2d 700 (2010). Our Supreme Court has thus held that, where police may have unreasonably failed to ask a woman if she lived in an apartment before forcibly removing her, the imminent harm, identifiable victim exception did *not* apply because "[t]hese are, indeed, the situations in which we want to encourage police to use their discretion in order to parse as carefully as possible between the extremes of an unwanted guest that is causing a criminal disturbance and a peaceable actual possessor whom the landlords are endeavoring to use the police to evict." *Fleming* v. *Bridgeport*, 284 Conn. 502, 535, 935 A.2d 126 (2007).

Thus, the imminent harm, identifiable victim exception and the broader rule that an officer is liable for breaching a ministerial duty appear to be two sides of the same coin. Both reflect a value judgment that, when a municipal officer must choose between various responses to a situation, making that officer liable for choosing unreasonably would distract the officer with fears of second-guessing and retaliatory lawsuits, and so would discourage the officer from choosing reasonably. On the flip side, if—for one reason or another—a particular course of action is *mandated*, then the threat of liability operates normally and encourages the officer to choose the mandated course of action.

The ministerial duty rule and the imminent harm, identifiable victim exception simply embody two different reasons why a particular course of action would be mandated, such that liability is appropriate if the officer makes the wrong choice. On the one hand, a ministerial duty entails a duty to act in a certain way that is mandated by rules, policies or directives. See *Violano* v. *Fernandez*, 280 Conn. 310, 325, 907 A.2d 1188 (2006). On the other hand, the imminent harm, identifiable victim exception entails a duty to avoid acting in a certain way and is mandated because, if one did act in that way, it would expose a victim to imminent harm. See *Sestito* v. *Groton*, 178 Conn. 520, 522–23, 423 A.2d 165 (1979) (police officer sat in car and watched drunken brawl unfold until victim was shot).

This understanding of the policies behind discretionary act immunity and the imminent harm, identifiable victim exception makes it highly unlikely that the first formulation—that the exception operates as an off switch for immunity in high stakes situations—is cor-

rect. If making officers liable for choosing unreasonably is understood to distract them with secondary concerns about liability and so discourage reasonable choices, then it would be especially dangerous for tort law to require officers to choose reasonably in high stakes situations.[9] Rather, the second formulation seems to be correct, namely, that the exception applies only if an officer chooses a course of action that was clearly beyond the pale because it was apparent that it would likely subject someone to imminent harm.

Accordingly, the exception requires not only that it be apparent that a victim was at risk of imminent harm, but also that it be apparent that the defendants' chosen response or nonresponse to the imminent danger was likely to subject the victim to that harm.

C

Keeping this general framework in mind, we next turn to the specific elements of the imminent harm, identifiable victim exception. The defendants, as the parties moving for summary judgment, had the burden of showing that as to at least one of the three elements of the imminent harm, identifiable victim exception—(1) imminent harm; (2) identifiable victim; (3) apparentness—no reasonable jury could conclude from the evidence submitted that it was met. See *Haynes* v. *Middletown*, supra, 314 Conn. 313.

We hold that a jury reasonably could conclude that each of the three elements was met. The evidence and reasonable inferences from it permitted a jury to find both that the defendants relayed the report of an emergency to the 911 dispatcher in such a way that she thought it a joke and that it was apparent that this would likely prevent her from sending anyone, leaving White's emergency unaddressed and so subjecting her to imminent harm from the storm. See footnote 3 of this opinion.

1

We begin with the third element, apparentness, because the defendants focus the bulk of their arguments on it. We conclude, however, that this focus is misguided. Each of the three cases from our Supreme Court discussing apparentness has done so in the context of an information asymmetry, i.e., where some other person knew more than the municipal defendant and those extra facts were crucial to understanding the danger at hand.[10] See *Doe* v. *Petersen*, 279 Conn. 607, 610, 620, 903 A.2d 191 (2006) (because town employee nervously interrupted rape victim, telling her to " 'hold on a second' " when she tried to tell him that her tennis coach had raped her, and then got in his car and drove off, it was not apparent to employee that she had been raped or that treating her this way would compound trauma); *Fleming* v. *Bridgeport*, supra, 284 Conn. 508 n.8, 534–35 (because police never asked woman if she

lived in apartment, it was not apparent to them that she was a resident and that forcibly removing her was thus unwarranted); *Edgerton* v. *Clinton*, supra, 311 Conn. 234 (because car chase sounded quiet over phone, it was not apparent to 911 operator that car might be driving at dangerously high speed and so should be told to stop chase).

By contrast, here there was no information asymmetry. A jury could reasonably infer that the tax collector told Powers all the relevant facts: there was a woman without rain gear, with her hands raised to the sky, who was standing out in a field near the ocean during a severe storm, and she needed medical attention. There is no additional fact that the defendants lacked at the time but that later came to light, which would have revealed the true nature of the emergency. Accordingly, the real question is not the apparentness of any imminent harm under the third element of the exception, but whether, on the basis of the facts the defendants had, any harm was imminent under the first element of the exception.[11] Because no information asymmetry existed, if the evidence established that harm was imminent, then the same evidence would have made that harm apparent to the defendants.

### 2

The second element of the exception—whether White was an identifiable victim—similarly presents no obstacle. The defendants do not dispute this element, except insofar as it is intertwined with the imminent harm element because an "allegedly identifiable person must be identifiable as a potential victim *of a specific imminent harm*." (Emphasis added.) *Doe* v. *Petersen*, supra, 279 Conn. 620–21. Here, a jury could reasonably infer that the tax collector pinpointed White as a potential victim of the storm. Powers acknowledged as much in his call to the 911 dispatcher, joking that White should be easy to identify because "[s]he should be the person standing out in the rain" in the field. A jury reasonably could conclude that White was an identifiable victim.

### 3

Finally, we turn to the first element of the exception, whether harm was imminent. We begin by discussing the scope of the harm and conclude that it is the general nature of the harm—not its specific manifestation— that must be imminent. We then set forth the test for whether a harm is imminent. We conclude from our Supreme Court's decisions that the test is whether, on a given day, the harm is more likely than not to occur. Applying that test to the facts here, we hold that a jury reasonably could conclude from the evidence that it was apparent that the manner in which Powers called the emergency in to dispatch, together with the defendants' failure to respond themselves, ensured that White's emergency would go unaddressed, leaving her

to fend for herself close to the ocean during a severe storm, and thus likely subjecting her to imminent harm from the storm. As such, there was a genuine issue of fact as to whether the imminent harm element was met.

a

We begin by determining the scope of the harm that must be imminent. The plaintiff argues that it is the general nature of the harm that must be imminent— here, harm from the storm. By contrast, the defendants argue that it is the specific manner of harm that befell the victim that must have been imminent—here, White's "drowning off of the coastline." We agree with the plaintiff. The "general nature" test is supported by two lines of cases, one about the scope of harm in the duty of care context, and the other cautioning against hypertechnical application of the law. As to the court's passing remark in *Doe* v. *Petersen*, supra, 279 Conn. 620–21, about a "specific imminent harm," we conclude that it did not change the standard to require that harm be more narrowly defined.

In the context of the duty of care, our Supreme Court has held that so long as "harm of the *general nature* as that which occurred is foreseeable there is a basis for liability even though the manner in which the accident happens is unusual, bizarre or unforeseeable." (Emphasis added; internal quotation marks omitted.) *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 335, 107 A.3d 381 (2015). The Supreme Court has directly likened immunity to the duty of care. *Doe* v. *Petersen*, supra, 279 Conn. 613 ("[t]he issue of governmental immunity is simply a question of the existence of a duty of care"); *Durrant* v. *Board of Education*, 284 Conn. 91, 100–101, 931 A.2d 859 (2007) ("immunity . . . is in effect a question of whether to impose a duty of care"). It would thus seem that—although a much higher *level of risk* is needed to establish an imminent harm than to establish a foreseeable harm—the harm should be defined at the same *level of generality* in each case. See *Haynes* v. *Middletown*, supra, 314 Conn. 320–23 (contrasting level of risk required for imminent harm test versus foreseeable harm test).

Adopting the defendant's narrow framing of the scope of harm also "would be inconsistent with our longstanding body of case law that repeatedly has eschewed applying the law in such a hypertechnical manner so as to elevate form over substance." (Internal quotation marks omitted.) *Grady* v. *Somers*, supra, 294 Conn. 348. Especially in the context of imminent harm, a cry for help need not cite chapter and verse to warrant a response. These are precisely the cases in which a lengthy exposition of the specific manner in which one is about to be injured is both unnecessary and impractical.

We note, however, that our Supreme Court did state

in passing, in *Doe* v. *Petersen*, supra, 279 Conn. 620–21, that a plaintiff "must be identifiable as a potential victim of a *specific* imminent harm."[12] (Emphasis added.) We conclude, for two reasons, that this language does not narrow the framing of imminent harm.

First, in *Doe* itself, the specificity of the harm played no role in the court's analysis and the court gave no indication that by including the word "specific" in one sentence it intended to overrule the prior consensus— at least in duty of care cases, to which the court has likened immunity cases—that the general nature of the harm is what matters. Id.; see also *Gazo* v. *Stamford*, 255 Conn. 245, 250, 765 A.2d 505 (2001) ("the test for the existence of a legal duty of care entails . . . a determination of whether an ordinary person . . . would anticipate that harm of the *general nature* of that suffered was likely to result" [emphasis added; internal quotation marks omitted]); *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 333, 430 A.2d 1 (1980) ("so long as harm of the *general nature* as that which occurred is foreseeable there is a basis for liability even though the manner in which the accident happens is unusual, bizarre or unforeseeable" [emphasis added]); *Figlar* v. *Gordon*, 133 Conn. 577, 582, 53 A.2d 645 (1947) ("the test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the *general nature* of that suffered was likely to result . . . ." [emphasis added]).

Second, although the "specific imminent harm" language from *Doe* has been quoted in a handful of subsequent appellate cases, the court has never relied on that language in its analysis. See *Cotto* v. *Board of Education*, 294 Conn. 265, 276, 984 A.2d 58 (2009) ("[a]n allegedly identifiable person must be identifiable as a potential victim of a *specific* imminent harm" [emphasis added; internal quotation marks omitted]);[13] *Grady* v. *Somers*, supra, 294 Conn. 354 (same); *Merritt* v. *Bethel Police Dept.*, 120 Conn. App. 806, 816, 993 A.2d 1006 (2010) (same); *Thivierge* v. *Witham*, 150 Conn. App. 769, 779, 93 A.3d 608 (2014) (same); *Jahn* v. *Board of Education*, 152 Conn. App. 652, 662, 99 A.3d 1230 (2014) (same); *Texidor* v. *Thibedeau*, 163 Conn. App. 847, 861, A.3d (2016) (same). Moreover, our Supreme Court's most recent cases omit the "specific imminent harm" language entirely. See *Bonington* v. *Westport*, supra, 297 Conn. 314–15 (omitting "specific imminent harm" language), *Edgerton* v. *Clinton*, supra, 311 Conn. 227–31 (same); *Haynes* v. *Middletown*, supra, 314 Conn. 312–13 (same). We thus conclude that it is the general nature of the harm—not its specific manifestation— that must be imminent.[14]

b

We next set forth the test for whether a harm is imminent. "[T]he proper standard for determining whether a harm was imminent is whether it was appar-

ent to the municipal defendant that the dangerous condition was *so likely to cause harm* that the defendant had a clear and unequivocal duty to act *immediately* to prevent the harm."[15] (Emphasis added.) *Haynes* v. *Middletown*, supra, 314 Conn. 322–23. This test focuses on the "magnitude of the risk," not on the temporal or geographical scope of that risk. (Emphasis omitted.) Id., 322. In short, the question is whether a situation is so dangerous that it merits an immediate response. See id., 325.

Such a test for the imminent harm element is highly fact specific. See *Williams* v. *Housing Authority*, 159 Conn. App. 679, 705–707, 124 A.3d 537 (breaking out imminent harm test into four prongs), cert. granted on other grounds, 319 Conn. 947, 125 A.3d 528 (2015). Reasonable people often disagree over how dangerous something is, and over how urgent a response is required. Nevertheless, seven cases from our Supreme Court provide guideposts within which to navigate that test. The rough rule of thumb gleaned from these cases is that a harm merits an immediate response—and thus is "imminent"—if, on a given day, it is more likely than not to occur.

In three cases, the court held that a jury reasonably could conclude that harm was imminent. In the first case, a jury reasonably could have found that a police officer remained in his car and watched as a drunken brawl involving the victim as well as a suspected armed robber and several bar patrons unfolded in a bar's parking lot. *Sestito* v. *Groton*, supra, 178 Conn. 522–23. One of the assailants ultimately shot and killed the victim. Id., 523. The court held that these facts were egregious enough that the case should have been submitted to the jury.[16] Id., 528.

In the second case, a jury reasonably could have found that school administrators knew that elementary school children needed to be supervised lest they "run and engage in horseplay that often results in injuries." (Internal quotation marks omitted.) *Purzycki* v. *Fairfield*, 244 Conn. 101, 110, 708 A.2d 937 (1998), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014). Nevertheless, the students were dismissed from lunch to traverse an unsupervised hallway on their way to recess. Id. On one such occasion, the eight year old victim was tripped by another student as he ran down the hallway, causing him to plunge headfirst through the window of the exit door and sustain injuries. Id., 104. The court held that a jury reasonably could have concluded that the unsupervised hallway presented an imminent harm.[17] Id., 110.

In the third case, a jury reasonably could have found that school administrators knew students were prone to horseplay while changing clothes in the locker room. *Haynes* v. *Middletown*, supra, 314 Conn. 325. Neverthe-

less, the students were left to change unsupervised in a locker room where one locker was broken with a jagged edge. See id., 308, 325. On one such occasion, the minor victim was shoved into the jagged locker and he sustained injuries. Id., 306, 308. The court held that a jury reasonably could have concluded that the unsupervised locker room with the jagged locker presented an imminent harm. Id., 325–26.

In the other four imminent harm cases, the court held that no reasonable jury could conclude that harm was imminent.[18] In the first case, the complaint alleged that municipal officers failed to adequately inspect apartment buildings for fire code violations. *Evon* v. *Andrews*, 211 Conn. 501, 502 n.4, 559 A.2d 1131 (1989). Eventually, the victims' apartment burned down, killing them. Id., 502. The court held that, although a fire did eventually occur, "[t]he risk of fire implicates a wide range of factors that can occur, if at all, at some unspecified time in the future." Id., 508. Without more, the general risk of fire was so attenuated that, as a matter of law, it was not an imminent harm. See id.

In the second case, the complaint alleged that a city failed to adequately supervise, secure, and lock up a building after taking it by eminent domain, from which the previous owners-victims had yet to remove their personal possessions. *Violano* v. *Fernandez*, supra, 280 Conn. 313–14, 322. Seven months after the taking, someone stole the victims' possessions from the building. Id., 313–14. The court held that, although a theft did eventually occur, "[t]he risk of a theft, like the risk of a fire, implicates a wide range of factors that can occur, if at all, at some unspecified time in the future." (Internal quotation marks omitted.) Id., 331. Without more, the general risk of theft was so attenuated that, as a matter of law, it was not an imminent harm. See id., 332.

In the third case, the trier of fact found that custodians failed to adequately clean and inspect a school bathroom, often leaving its floor covered in urine during the summer months when various youth programs met at the school. *Cotto* v. *Board of Education*, supra, 294 Conn. 270. One day, the victim—a director of one of the youth programs—slipped on the wet floor as he walked into the bathroom, sustaining injuries. Id., 268–69. The court held that, although the victim did eventually slip on the floor, the risk of harm "was neither sufficiently immediate nor sufficiently certain. . . . [B]ecause any person using the bathroom could have slipped at *any* time . . . during the summer months . . . the risk of harm was not imminent . . . ." (Emphasis in original.) Id., 279. Without more, the general risk of slipping was so attenuated that, as a matter of law, it was not an imminent harm.[19] See id., 279–80.

In the fourth case, the complaint alleged that the victims' neighbors raised the grade of their property in such a way that significant rainfall caused "excessive

amounts of surface water [to be] discharged onto the [victims'] property causing flooding, erosion and threatening the integrity of the septic system . . . ." (Internal quotation marks omitted.) *Bonington* v. *Westport*, supra, 297 Conn. 313; see id., 315. Because town zoning officials would not act, the victims eventually were forced to incur legal costs to correct the problem themselves. Id., 313–14. The court held that, although rain may have been inevitable and the victims did ultimately bring legal action, "a *significant* rainfall causing excessive surface runoff necessarily would occur at an indefinite point in time" and so "there was no definite point in time when the [victims] necessarily would have undertaken [legal] action."[20] (Emphasis added.) Id., 315. The general risk of rain heavy enough to force the victims to bring legal action was so attenuated that, as a matter of law, it was not an imminent harm. See id.

The primary difference between the three cases sending the question of imminent harm to the jury and the four cases holding that as a matter of law harm was not imminent appears to be that, whereas in the former, a jury reasonably could conclude that, on a given day, the harm was more likely than not to occur; in the latter, the complaint alleged only a low level general risk that, after a long enough time, eventually came to fruition. Such a distinction is certainly somewhat subjective on the margins. It is, however, the most logical reading of the standard announced by our Supreme Court in *Haynes* v. *Middletown*, supra, 314 Conn. 323, and it holds true to the ordinary meaning of the term "imminent harm." See id., 318 n.10 (American Heritage Dictionary of the English Language defines "imminent" as "[a]bout to occur; impending" and Merriam-Webster's Collegiate Dictionary defines "imminent" as "ready to take place; esp[ecially]: hanging threateningly over one's head" [internal quotation marks omitted]).

c

We thus turn to the facts of this case. To be entitled to summary judgment, the defendants ultimately bore the burden of proving that the exhibits presented in support of and in opposition to their motion for summary judgment, considered as a whole, would not permit any reasonable jury to conclude that it was apparent that the manner in which the defendants reported the situation to dispatch, combined with their failure to respond themselves, subjected White to imminent harm—i.e., made it more likely than not that she would become a victim of the storm. We hold that a jury reasonably could so conclude and thus the court erred in granting the defendants' motion for summary judgment.

As to the scope of the harm, at least on the facts of this case, "harm from the storm" is an appropriate framing. The defendants were told of a woman out in a severe storm by the ocean who needed medical

attention. Ultimately, she drowned. Although there were many ways that the storm could have taken White's life, the general nature of the harm was the same—exposure to the elements while she was in a vulnerable state. For purposes of the imminent harm analysis, that is what matters. The dissent argues that this is too general a framing, and that it amounts to saying that "any harm that befell [White] . . . no matter how attenuated from the dangerous condition, was imminent harm . . . ." We do not mean to suggest that any harm would suffice. For example, if White had been mugged, or had injured her hand on a defective, jagged railing, or had otherwise been injured by something apart from the storm, then we would agree with the dissent that such a harm, as a matter of law, was too attenuated from the risk posed. Nevertheless, wandering out near the ocean, at night, during a severe storm, poses certain risks, including being hit by debris that is caught up in the wind, being electrocuted by downed power lines or by lightning, slipping on a wet surface and hitting one's head, as well as drowning in a pool of water or in the ocean. Those risks are heightened if the person out in the storm needs medical attention or otherwise is in a vulnerable state.

The dissent seems to agree that had White fallen in the field and drowned in a pool of water *there*—a risk that came up at the internal police investigation into the adequacy of the defendants' response that night—then that harm would have been within the general nature of the risk posed. The dissent concludes, however, that the extra one-half mile between where White was last seen and where a jury could find that she drowned removes her drowning from the general nature of harm posed by the storm, as a matter of law. We do not attribute the same importance to that one-half mile, and so we conclude that a jury reasonably could find that White's drowning in the storm was harm of the same general nature as the risk posed by the storm.[21] Cf. *Haynes* v. *Middletown*, supra, 314 Conn. 325 ("we are unable to conclude that no reasonable juror could find that [the imminent harm, identifiable victim exception was met]").

As to whether that harm was imminent, the evidence presented on the defendants' motion for summary judgment, construed in the light most favorable to the plaintiff, permitted an inference that the storm was so severe that the defendants were unable to perform their regular boat patrol. The storm prevented the defendants even from leaving their cruiser to check the field for White, in case she had fallen and was injured.

There was evidence before the court that Powers nevertheless did not take the report that White was in danger seriously.[22] He testified at his deposition that "[i]f a person was in physical danger . . . [he] would respond" but that he did not think White presented a

"true emergency." His actions, in driving away from White to go inspect the brand new bilge pumps from the car for a second time, and in refusing to leave his cruiser to look for White lest he have to "walk through a field in the pouring rain," both suggest that he did not think White presented a true emergency.

There was evidence before the court that Powers conveyed his opinion that White did not present a true emergency to the 911 dispatcher. The transcript of the 911 call shows that, rather than tell the dispatcher that a woman out in the storm needed medical attention, Powers chuckled with the dispatcher over the "lady . . . standing in a field with a raincoat on, looking up at the sky." When Powers followed that comment with "[t]hey think she might need medical help," both the context and the dispatcher's response of, "[g]eez, do you think?" suggest that this remark was meant and understood not in its literal sense, as a statement that White was in danger and needed assistance, but as a joke about White's mental health. Powers' chuckling throughout the 911 call similarly suggested to the dispatcher that this was not a serious report of an emergency. Given the overall tone of the call, a jury reasonably could conclude that Powers' request that the dispatcher "send, uh, Rizzo or one of them" to the "person standing out in the rain" was made in much the same joking manner.[23]

A jury reasonably could conclude that the defendants thus cut off all three avenues of help available to White. First, Powers told the tax collector that "he would take care of it," leading her to believe that there was no more that she needed to do. Second, he reported the emergency to the 911 dispatcher in such a way that she would think it was a joke and not send anyone. Third, he and Milardo did not respond themselves, but rather drove away from White and did not return until a couple of hours later, by which time White was no longer standing in the field. Accordingly, a jury reasonably could conclude that it was apparent to the defendants that by cutting off all avenues of help available to a woman out in a severe storm by the ocean who needed medical attention, they made it more likely than not that White would wind up a victim of the storm. Indeed, that is what happened.

Because the defendants failed to carry their burden of proving that there was no genuine issue of fact that at least one element of the imminent harm, identifiable victim exception was not met, the defendants were not entitled to judgment as a matter of law. The court's rendering of summary judgment was thus improper.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion MIHALAKOS, J., concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] We refer to Powers and Milardo as the defendants. Although their employer, the town of Westbrook, is an additional defendant, for purposes of this appeal all parties agree that the town's liability derives from and is the same as the constables' liability, if any.

[2] The plaintiff raised a second claim on appeal as "an issue of first impression," namely, that we should adopt a new exception to discretionary act immunity, to be applied when an officer "make[s] misrepresentations of fact . . . to avoid having to do any work." We do not review that claim because the plaintiff never raised it before the trial court. See *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619, 99 A.3d 1079 (2014) ("[a]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level" [internal quotation marks omitted]). The plaintiff argues that she did raise the claim before the trial court in four ways: (1) in her complaint, when she alleged that White died "*as a result of*," "Officers Powers' and Milardo's failure to be truthful and satisfy their roles as Constables"; (2) in her opposition to the defendants' motion for summary judgment, when she argued that the defendants had "*breached the duty* they owed the plaintiff" because "[a] reasonable officer would not have misrepresented his or her whereabouts to dispatch in order to avoid responding to a call for medical aid"; (3) at oral argument on the summary judgment motion, when she argued that Powers "misrepresented where he was" because he "wanted to fly under the radar that night"; and (4) in her motion for reconsideration, when she argued that "the Officers' misrepresentation about their assignment and whereabouts" in response to "a report of a citizen in need of aid" raised a "genuine issue of material fact [as to whether] the decedent, Elsie White, was an *identifiable victim subject to imminent harm*." (Emphasis added.)

We disagree that any of these four statements to the trial court raised the legal issue of whether the court should carve out a new exception to discretionary act immunity for lying. The first two statements did not concern immunity. The third statement, even in context, was vague and failed to raise anything distinctly. The fourth statement expressly concerned an exception to discretionary act immunity that already exists, namely, the imminent harm, identifiable victim exception. As a result, the trial court's memorandum of decision did not address the issue of whether to adopt a new exception to discretionary act immunity for lying. We will not decide that issue for the first time on appeal.

[3] The full transcript of Powers' call to the 911 dispatcher was as follows:

"Dispatcher [Theresa] Smith: State police dispatcher Smith, can I help you?

"Officer Powers: You always say that same thing. Is this a recording or what? (chuckles)

"Dispatcher Smith: I'm gonna try like hell.

"Officer Powers: Try like hell. Listen, uh, a person stopped by and they said there's a lady up on Route 1 up by Ambleside,

"Dispatcher Smith: Ok.

"Officer Powers: standing in a field with a raincoat on, looking up at the sky

"Dispatcher Smith: (chuckles)

"Officer Powers: (chuckles) They think she might need medical help. Can

"Dispatcher Smith: Geez, do you think?

"Officer Powers: you send, uh, send, uh, Rizzo or one of them

"Dispatcher Smith: Ok.

"Officer Powers: I can't leave the boat.

"Dispatcher Smith: Ok. Where, she's at Route 1 near Ambleside?

"Officer Powers: Yeah, someplace in a field up there.

"Dispatcher Smith: Ok.

"Officer Powers: She should be the person standing out in the rain. (chuckling)

"Dispatcher Smith: Ok.

"Officer Powers: Bye.

"Dispatcher Smith: Bye."

[4] The plaintiff did not properly raise any other exceptions to the doctrine of discretionary act immunity.

[5] See also *Curran* v. *Kroll*, 303 Conn. 845, 857, 37 A.3d 700 (2012) ("[T]he line between permissible inference and impermissible speculation is not always easy to discern. . . . At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . . [P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence

of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." [Internal quotation marks omitted.]).

[6] The defendants also moved for summary judgment on two other grounds, namely, duty and proximate cause. Because the court granted summary judgment in favor of the defendants on the basis of immunity, the court did not rule on these two other issues.

[7] As to the town, its liability derives from two statutes. First, General Statutes § 52-557n makes "a municipality . . . liable for . . . [the] negligent act or omission of a municipal officer acting within the scope of his or her employment or official duties . . . [but] shields a municipality from liability for . . . [an officer's] negligent acts or omissions which require the exercise of judgment or discretion . . . ." (Internal quotation marks omitted.) *Haynes* v. *Middletown*, supra, 314 Conn. 312. The imminent harm, identifiable victim exception qualifies the town's discretionary act immunity under § 52-557n just as it qualifies the officer's common-law discretionary act immunity. *Grady* v. *Somers*, supra, 294 Conn. 348. Second, General Statutes § 7-465 permits a plaintiff to seek indemnification from a municipality for its officers' negligent conduct. Id., 337–38.

[8] Discretionary act immunity may be decided by a jury because it shields a defendant only from liability, not from being sued. See *Edgerton* v. *Clinton*, 311 Conn. 217, 227 n.9, 86 A.3d 437 (2014). By contrast, sovereign immunity, which is not at issue here, implicates subject matter jurisdiction and includes both immunity from liability and immunity from suit. Id.

[9] But see *Purzycki* v. *Fairfield*, 244 Conn. 101, 108 n.5, 708 A.2d 937 (1998) ("[t]he ultimate test of the existence of a *duty to use care* is found in the foreseeability that harm may result if it is not exercised" [emphasis added; internal quotation marks omitted]), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014).

[10] A fourth case, although superficially relevant, is not instructive. To wit, in one of the earliest cases to address the imminent harm, identifiable victim exception, our Supreme Court summarily held that the exception did not apply because the police officer in that case "could [not] have been aware that [the] conduct [of the drunk driver whom he pulled over and who later crashed into another motorist after being let off with a warning] threatened an identifiable victim with imminent harm." *Shore* v. *Stonington*, 187 Conn. 147, 154, 444 A.2d 1379 (1982). Although that holding has been variously characterized as turning on the imminent harm element; see *Evon* v. *Andrews*, 211 Conn. 501, 508, 559 A.2d 1131 (1989) ("[t]he present allegations do not even rise to the level of the imminence we rejected in *Shore* v. *Stonington*"); and the apparentness element; see *Doe* v. *Petersen*, 279 Conn. 607, 617, 903 A.2d 191 (2006) ("*Shore* remains our only decision in which we declined to abrogate discretionary act immunity on the basis of a public officer's lack of awareness"); the court in *Shore* simply did not explain its reasoning on this point. See *Shore* v. *Stonington*, supra, 154.

[11] In their appellate brief, the defendants cite to evidence, obtained after White died, about her occasionally odd habits but generally good mental health in an attempt to downplay the significance of her wandering out into the storm on the night of June 18, 2008. Such evidence is irrelevant to the question before us because it was not before the defendants on the night in question.

[12] The defendants do not discuss *Doe* in their scope of harm argument and rely instead on our decision in *Swanson* v. *Groton*, 116 Conn. App. 849, 977 A.2d 738 (2009). The defendants argue that, in *Swanson*, this court "determined that the officer would have to know about the *specific harm* to befall the plaintiff." (Emphasis added.) On the contrary, the court in *Swanson* held that the officer would have to know "that [the assailant] was going to attack a *specific person*, namely, [the plaintiff] . . . ." (Emphasis added.) *Swanson* v. *Groton*, supra, 861. The court said this while discussing the identifiable victim element. Id. The defendants' reliance on *Swanson* for a narrow scope of harm under the imminent harm element is thus misplaced.

[13] The court's analysis in *Cotto* v. *Board of Education*, supra, 294 Conn. 279–80, a case about a youth program supervisor who slipped on a wet bathroom floor, comes closest to relying on the "specific imminent harm" language. The court's holding in that case, however, turned on the difficulty of pinpointing the plaintiff as uniquely likely to slip, out of the more than sixty program participants who used the bathroom. Id. The scope of the harm—i.e., slipping on a wet bathroom floor—was undisputed. See id.

[14] The dissent notes that, nevertheless, "the zone of such harm is not limitless." We emphatically agree. If the harm that occurs is far enough removed from the risk posed that the two are not of the same general nature, then the harm was not imminent.

[15] Although the defendants argue that the standard for imminent harm announced in *Haynes* is limited to cases about schoolchildren on school property, neither the language nor the rationale of *Haynes* indicates that its holding is so limited. See *Haynes* v. *Middletown*, supra, 314 Conn. 303. On the contrary, the court noted that to the extent there was a special rule in the school context, "that rule was limited to the 'identifiable person' prong of the exception." Id., 324 n.16. We are thus bound to follow the precedent of our Supreme Court. See *Brusby* v. *Metropolitan District*, 160 Conn. App. 638, 658, 127 A.3d 257 (2015) (applying *Haynes* outside school context). "[I]t is axiomatic that this court, as an intermediate body, is bound by Supreme Court precedent and [is] unable to modify it . . . ." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 148 Conn. App. 641, 645, 85 A.3d 1240, cert. denied, 311 Conn. 945, 90 A.3d 976, cert. denied sub nom. *Anderson* v. *Dzurenda*,    U.S.   , 135 S. Ct. 201, 190 L. Ed. 2d 155 (2014).

[16] Although *Sestito* created the imminent harm, identifiable victim exception, it was not until *Shore* v. *Stonington*, 187 Conn. 147, 153, 444 A.2d 1379 (1982), that the court used such terminology to describe the holding in *Sestito*. See *Haynes* v. *Middletown*, supra, 314 Conn. 333 (*Eveleigh, J.,* concurring). Due to the egregious nature of the facts in *Sestito* and the comparatively mild nature of the negligence claims that have since sought to invoke its holding, our Supreme Court has stated on two occasions that *Sestito* is limited to its facts. See *Grady* v. *Somers*, supra, 294 Conn. 353 ("*Sestito* appears, however, to be limited to its facts"); *Edgerton* v. *Clinton*, supra, 311 Conn. 240 ("we decided *Sestito* before we adopted the three-pronged imminent harm test and have found that its holding is limited to its facts"); but see *Cotto* v. *Board of Education*, supra, 294 Conn. 276 ("[a] good example of the application of these principles [of the imminent harm, identifiable victim exception] is *Sestito* v. *Groton*").

[17] The Supreme Court later overruled *Purzycki* in part, insofar as the standard it applied in assessing imminent harm focused on the limited temporal and geographical scope of the risk. *Haynes* v. *Middletown*, supra, 314 Conn. 323 ("[w]e therefore overrule [*Burns* v. *Board of Education*, 228 Conn. 640, 638 A.2d 1 (1994)] and *Purzycki* to the extent that they adopted a different standard"). The court does not, however, appear to have overruled the ultimate conclusion in *Purzycki* that a jury reasonably could have found imminent harm on those facts. See id., 322–23; see also id., 331 n.1 (*Eveleigh, J.,* concurring) ("[i]t is my understanding . . . that the majority opinion does not overrule entirely either *Burns* or *Purzycki*, but rather overrules only the treatment given to the definition of imminent harm contained in those opinions" [internal quotation marks omitted]).

[18] A fifth case, *Shore* v. *Stonington*, 187 Conn. 147, 444 A.2d 1379 (1982), has also been discussed as an imminent harm case although it did not actually identify which specific element or elements of the imminent harm, identifiable victim exception were lacking. See footnote 10 of this opinion. The most logical reading of *Shore* appears to be that it turned on the identifiable victim element, since the victim whom the drunk driver ultimately hit was unknown to the police officer and could have been anyone or no one on the road between the drunk driver's ultimate destination and where the police officer pulled him over. See *Shore* v. *Stonington*, supra, 150–51. Although a *class* of foreseeable victims might have existed—i.e., other motorists on the road—an identifiable *victim* did not. Cf. *Grady* v. *Somers*, supra, 294 Conn. 352 ("[t]he only identifiable class of foreseeable victims that we have recognized for . . . purposes [of the identifiable victim element] is that of schoolchildren attending public schools during school hours" [internal quotation marks omitted]).

[19] *Cotto* is perhaps the most difficult case to reconcile with our Supreme Court's recent decision in *Haynes* v. *Middletown*, supra, 314 Conn. 325, which did not discuss or cite *Cotto*. Although in *Cotto*, the court's imminent harm analysis can plausibly be read to turn on the degree of risk—the proper consideration under *Haynes*—a more honest reading is probably that it turned on the lack of a limited time period during which the plaintiff was exposed to the slippery floor—an improper consideration under *Haynes*. Compare *Cotto* v. *Board of Education*, supra, 294 Conn. 279–80 (analyzing imminent harm), with *Haynes* v. *Middletown*, supra, 322–23 (rejecting focus on duration of dangerous condition). *Cotto* and *Haynes* also reach opposite

results on quite similar facts. The main factual difference is that the victim was an adult in *Cotto* and a teenager in *Haynes*. Compare *Cotto* v. *Board of Education*, supra, 267, with *Haynes* v. *Middletown*, supra, 306. Although the age of a potential victim is relevant to whether harm is imminent; *Haynes* v. *Middletown*, supra, 315 n.7; a more satisfying explanation may be that *Cotto* really turned on the identifiable victim element and discussed imminent harm only in that regard. Compare *Cotto* v. *Board of Education*, supra, 279–80 (analyzing imminent harm), with id., 275 ("[a]lthough the trial court characterized the plaintiff as an identifiable individual . . . the court's determination was . . . improper" [citation omitted]), and id., 276 ("the criteria of identifiable person and imminent harm must be evaluated with reference to each other" [internal quotation marks omitted]).

[20] To the extent that *Bonington* asks whether the harm would "necessarily" occur, it stands in some tension with our Supreme Court's recent statement in *Haynes* that the proper standard is whether a harm is "so likely" to occur that immediate action is warranted. Compare *Bonington* v. *Westport*, supra, 297 Conn. 315, with *Haynes* v. *Middletown*, supra, 314 Conn. 323.

[21] Although the dissent suggests that White "drown[ed] . . . the next morning," no evidence compels that finding, and a jury reasonably could find that White drowned on the night of the storm. The police report attached as an exhibit to the defendants' summary judgment motion states that the last time anyone saw White anywhere in the town was at about 8 p.m. in the field. Powers' deposition testimony was that he and Milardo did not see anyone in the field when they drove past it at about 10 p.m. After 8 p.m., White was next seen at about 10 a.m. the following morning when a fisherman found her body floating face down in the water. Although the fisherman did not notice White's body when he went out on the water at 7 a.m., a jury reasonably could infer that this was either because the body had not yet washed up or because it was hidden from view by the large rocks. The deposition testimony of the investigator for the state medical examiner's office did not fix a time of death, and the police investigation report stated that no time of death was determined. As to the statement of Kanfer that unidentified "factors" suggested a time of death between 7 a.m. and 10 a.m., a jury reasonably could infer that those factors were simply a different reading of the significance of the fisherman not noticing a body at 7 a.m. and noticing one at 10 a.m., and would not be required to credit Kanfer's conclusion in that regard. Rather, a jury reasonably could infer that White more likely slipped and fell during the severe storm the night before than during the placid weather the next morning.

Construed in the light most favorable to the plaintiff as the party opposing summary judgment, the evidence permits an inference that White died the night of the storm.

[22] A jury that found that the defendants did not take the report seriously could still conclude that the danger was apparent. The test for apparentness is objective, asking "whether the circumstances would have made it apparent to a *reasonable* government agent that harm was imminent." (Emphasis added.) *Edgerton* v. *Clinton*, supra, 311 Conn. 231 n.14.

[23] The 911 dispatcher testified at her deposition: "I didn't put [Powers' 911 call] in the computer like I normally do. I didn't write it down to remind me to send someone." Although the dispatcher testified that she simply "forgot," a jury would not be required to credit this explanation. See *Palkimas* v. *Fernandez*, 159 Conn. App. 129, 133, 122 A.3d 704 (2015) ("it is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony" [emphasis omitted; internal quotation marks omitted]).