PALMER, J.
**258 The plaintiff in this certified appeal, Bernadine Brooks, administratrix of the estate of Elsie White, brought this action against the defendants, Robert Powers and Rhea Milardo, constables in the town of Westbrook,[1] alleging that their negligence in **259 responding to a report that a woman, subsequently identified as White, was standing in a field during a severe thunderstorm was a proximate cause of White's accidental drowning the next morning in Long Island Sound. The defendants filed a motion for summary judgment, claiming, inter alia, that the plaintiff's action was barred by governmental immunity as a matter of law.[2] The *370 trial court granted the motion, and the plaintiff appealed to the Appellate Court, which reversed the judgment of the trial court, concluding that there was a genuine issue of material fact as to whether the defendants' conduct falls within the identifiable person, imminent harm exception to that immunity. Brooks v. Powers , 165 Conn.App. 44, 47-48, 80, 138 A.3d 1012 (2016). On appeal, the defendants contend that the Appellate Court incorrectly determined that a jury reasonably could find that White was an identifiable person subject to imminent harm for purposes of abrogating the defendants' governmental immunity. We agree and, accordingly, reverse the Appellate Court's judgment.[3]
The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "The parties submitted numerous deposition transcripts, police reports, and other exhibits in support of and in opposition to the [defendants'] motion for summary judgment. Viewed in the light most favorable to the plaintiff as the party opposing summary judgment, that **260 evidence would permit the following findings of fact. At roughly 6 p.m. on June 18, 2008, a storm rolled into the coastal town of Westbrook (town). Powers testified at the internal affairs investigation into his conduct, the transcript of which the plaintiff included in her opposition to the defendants' motion for summary judgment, that '[i]t was ... a dark and stormy night.... Very, very dark and very stormy.'
"The defendants were scheduled for boat patrol that evening from 6 ... until 10 p.m. By the time they arrived for work, however, the weather was already severe. The thunderstorm brought with it both torrential downpours and lightning. Due to the storm, the defendants were unable to take the boat out onto the water for the regular boat patrol and were not required to work that night. If they did work, they were to patrol the marinas and other parts of town, ensure that the boat was ready to go out if necessary, and respond to any emergencies that arose.
"When the defendants arrived for work, they punched in, got into a cruiser, and drove to [a donut shop]. After that, they drove to the marina to inspect the boat. Milardo testified at her deposition that 'the main concern [was] that the bilge pumps were operating properly.' Powers testified at his deposition that they did not need to get out of the [cruiser] to inspect the boat: '[W]e would just look to make sure that the boat was still there and check the pumps. I don't know.' Milardo testified at her deposition that she and Powers 'just sat in the parking lot and could see that the water was being discharged from the back of the boat through the bilge pumps.' The bilge pumps were brand new.
"Once they completed their inspection, the defendants drove to a [convenience store] on [Boston Post Road in Westbrook]. Powers stayed with the cruiser while Milardo went in to get some snacks. At [approximately **261 7:30 p.m.], the town tax collector drove up to the [store]. She appeared concerned and told Powers that there was a woman who needed medical attention in a field just up the road. She said that the woman was wearing a shirt and pants, without a coat or any other rain gear, and was standing with her hands raised to the sky. At that time, [although it *371 was still light outside] it was raining heavily and there was thunder and lightning. The field was about one-half mile from the ocean and less than one-half mile from the [convenience store].
"Powers told the tax collector that he would take care of the situation, and [the tax collector] drove away under the impression that she no longer needed to call 911 because the constable was going to take care of [the matter]. Powers then called the 911 dispatcher and told her that 'a person stopped by and they said there's a lady up on [Boston Post Road] up by Ambleside [Apartments] ... standing in a field with a raincoat on, looking up at the sky.' While Powers and the dispatcher chuckled over this, he told the dispatcher that '[t]hey think she might need medical help,' to which the dispatcher replied, '[g]eez, do you think?' Powers asked the dispatcher to send 'Rizzo or one of [the other constables],' explaining that 'I can't leave the boat.' The dispatcher asked where the person was, and Powers said that she was in a field on the side of [Boston Post Road] near Ambleside Apartments. 'She should be the person standing out in the rain,' he said, chuckling, before saying goodbye.
"The dispatcher never sent anyone to the field. She testified at her deposition: 'I didn't put [Powers' 911 call] in the computer like I normally do. I didn't write it down to remind me to send someone.' She testified that she simply 'forgot.'
"After speaking with the dispatcher, the defendants drove back to the marina to check the boat again. They **262 did not get out of the [cruiser] ... but looked at the boat from [inside] the [cruiser]. The bilge pumps were still pumping. Powers testified at his deposition that he knew the pumps were new.
"The defendants then heard a call on the police scanner about a baby choking and joined the fire department in responding to that call. A couple of hours later, the defendants drove along [Boston Post Road] past the field by Ambleside Apartments out to the town line and then looped back toward the center of town. As they passed the field where the tax collector had seen the woman, they drove more slowly and turned the cruiser's spotlight on. The grass in the field was knee-high. They did not see anyone. Neither constable got out of the [cruiser]. Powers testified at the internal affairs investigation ... that, '[n]o. I wouldn't go out and walk through a field in the pouring rain.' When asked if [he and Milardo] could have gotten out to do a more thorough sweep of the area, since the woman 'could have fallen down or something,' Powers replied: '[C]ould have gone home. Could have gone for a walk. Could have.'
"A former police officer, whom the plaintiff deposed as to the adequacy of the defendants' response, remarked that 'the single most important thing that I saw [was] that [the tax collector] clearly told [Powers] that [there was] a woman that needed medical attention.... If you've got somebody that might need [medical attention] or somebody that does need it, you go.... The fact that you have somebody that's a human needing something that someone else interprets as medical attention, whether it's might or does, you respond.' Powers testified at his deposition that, '[i]f a person was in physical danger ... [he] would respond,' but that he did not think the woman in the field presented a 'true emergency.'
**263 "The morning after the storm, on June 19, 2008, a fisherman went out on the water in his boat at about 7 a.m. When he returned from fishing at about 10 a.m., he noticed something washed up among the large rock boulders near the shore just west of his house, less than one mile from *372 where White was last seen. When the fisherman went to inspect [what he noticed], he discovered that it was a body floating face down in the water. [The] [p]olice identified the body as White by the CVS pharmacy and Stop & Shop [scan] cards attached to a keychain clenched in her fist. The tax collector, who knew White personally, later confirmed that this was the same woman she had seen in the field the night before. White was pronounced dead at 11:01 a.m. The cause of death was accidental drowning.
"As to time of death, the police incident report stated that the 'investigation did not conclusively pinpoint a time when White entered the water.' [The defendants, however, submitted the deposition testimony of Julie Wolf, a special investigator for the state medical examiner's office, who arrived at the scene at approximately 12:30 p.m. on June 19, 2008, and examined White's body. Wolf] testified that she observed rigor mortis of the fingers, elbows, and knees, but not of the hips, and no lividity of the body.... The defendants also submitted a single page of [a] transcript from an arbitration hearing at which Ira Kanfer, an associate medical examiner, [estimated the time of death to be between 7 and 10 a.m. on June 19, 2008, which, according to Kanfer, was consistent with the beginning stages of rigor mortis observed by Wolf at 12:30 p.m.]."[4] (Footnote omitted.) Id., at 48-52, 138 A.3d 1012.
**264 The plaintiff commenced this action, alleging that the defendants' actions on the night of June 18, 2008, were negligent and the cause of White's death. The defendants moved for summary judgment, claiming that they were shielded from liability as a matter of law by the immunity afforded municipal employees for their discretionary acts. In response, the plaintiff maintained that the defendants' conduct fell within the identifiable victim, imminent harm exception to that immunity and that summary judgment was therefore inappropriate because the defendants' entitlement to such immunity presented a factual issue to be decided by the jury.
The trial court granted the defendants' motion. First, however, the court reviewed the principles pertaining to the doctrine of governmental immunity, which may be summarized as follows: "[Section] 52-557n[5] abandons the common-law principle *373 of municipal sovereign immunity and establishes the circumstances in which a municipality may be liable for damages.... One **265 such circumstance is a negligent act or omission of a municipal officer acting within the scope of his or her employment or official duties.... [Section] 52-557n (a) (2) (B), however, explicitly shields a municipality from liability for damages to person or property caused by the negligent acts or omissions [that] require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Footnote added; internal quotation marks omitted.) Coley v. Hartford , 312 Conn. 150, 161, 95 A.3d 480 (2014). "The hallmark of a discretionary act is that it requires the exercise of judgment."[6] (Internal quotation marks omitted.) Id. In the present appeal, the plaintiff makes no claim that the defendants' conduct was ministerial in nature; she concedes, rather, that their acts were discretionary.[7]
This protection for acts requiring the exercise of judgment or discretion, however, is qualified by what has become known as the identifiable person, imminent harm exception to discretionary act immunity. That exception, which we have characterized as "very limited";
**266 Strycharz v. Cady , 323 Conn. 548, 573, 148 A.3d 1011 (2016) ; "applies when the circumstances make it apparent to the [municipal] officer that his or her failure to act would be likely to subject an identifiable person to imminent harm .... By its own terms, this test requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm.... If the [plaintiff] fail[s] to establish any one of the three prongs, this failure will be fatal to [his] claim that [he] come[s] within the imminent harm exception." (Internal quotation marks omitted.) Id., at 573-74, 148 A.3d 1011. Finally, "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm." Haynes v. Middletown , 314 Conn. 303, 322-23, 101 A.3d 249 (2014).
Applying these principles, the trial court concluded in relevant part: "The evidence submitted establishes the absence of a genuine issue of material fact that the *374 harm to which the decedent was ultimately exposed, drowning in Long Island Sound, was not [evident] to the defendants .... The defendants were made aware only that the decedent was standing in a field during a severe storm on the night before her death, and that she may have been in need of medical attention.... The uncontroverted evidence submitted demonstrates that the decedent drowned the next morning in Long Island Sound, although she was initially reported to be located in a field on [Boston Post Road] ... the previous night. [In view of] the allegations [contained in] the plaintiff's complaint, and the evidence presented, the identifiable victim, imminent harm exception does not apply in this case."
The trial court further determined that, even if White were an identifiable person subject to imminent harm, **267 the plaintiff's claim would nevertheless fail under the apparentness prong of the identifiable person, imminent harm exception. In support of this conclusion, the court explained that, "[i]n order to meet the apparentness requirement, the plaintiff must show that the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm.... This is an objective test pursuant to which we consider the information available to the government agent at the time of [his or] her discretionary act or omission.... We do not consider what the government agent could have discovered after engaging in additional inquiry.... Imposing such a requirement on government officials would run counter to the policy goal underlying all discretionary act immunity, that is, keeping public officials unafraid to exercise judgment." (Internal quotation marks omitted.) In light of the facts presented by the plaintiff, the court concluded that, once the defendants were told by the dispatcher that another officer would be dispatched to check on White, it could not possibly have been apparent to the defendants that their failure to check on her themselves would subject White to a risk of imminent harm.
The plaintiff appealed to the Appellate Court, and that court, with one judge dissenting, reversed the judgment of the trial court. Brooks v. Powers , supra, 165 Conn.App. at 48, 80, 138 A.3d 1012. The Appellate Court concluded that there was a genuine issue of material fact as to whether, on the night of the storm, White was an identifiable victim subject to imminent harm. See id., at 47-48, 138 A.3d 1012. In reaching its decision, the Appellate Court reasoned, "[a]s to the scope of the harm, [that] at least on the facts of this case, 'harm from the storm' is an appropriate framing. The defendants were told of a woman out in a severe storm by the ocean who needed medical attention. Ultimately, she drowned. Although there **268 were many ways that the storm could have taken White's life, the general nature of the harm was the same-exposure to the elements while she was in a vulnerable state. For purposes of the imminent harm analysis, that is what matters." Id., at 76-77, 138 A.3d 1012. The Appellate Court further concluded that the proper test for determining whether harm is imminent is whether, "on a given day, it is more likely than not to occur." Id., at 71, 138 A.3d 1012. Applying this test to the facts of the case, the Appellate Court explained that "a jury reasonably could conclude from the evidence submitted in support of and in opposition to the defendants' summary judgment motion that it was apparent that the joking manner in which Powers called in the emergency to dispatch, together with the defendants' failure to respond themselves, made it more likely than not that White would become a victim of the storm." Id., at 55, 138 A.3d 1012. *375 In reaching this conclusion, the Appellate Court acknowledged that this court repeatedly has stated that, under the identifiable person, imminent harm exception to the discretionary act immunity that ordinarily protects municipal employees, "a plaintiff 'must be identifiable as a potential victim of a specific imminent harm.' " (Emphasis in original.) Id., at 68, 138 A.3d 1012, quoting Doe v. Petersen , 279 Conn. 607, 620-21, 903 A.2d 191 (2006).[8] According to the Appellate Court, because this court previously has likened governmental immunity to a duty of care; see, e.g., Durrant v. Board of Education , 284 Conn. 91, 100-101, 931 A.2d 859 (2007) ("immunity ... is in effect a question of whether to impose a duty of care"); and because, in ordinary negligence cases, a duty of **269 care arises when harm of the same general nature as that which occurred was foreseeable; see, e.g., Doe v. Saint Francis Hospital & Medical Center , 309 Conn. 146, 174-75, 72 A.3d 929 (2013) ("[t]he test for the existence of a legal duty of care entails ... a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result" [internal quotation marks omitted] ); the plaintiff was not required to prove that it was apparent to the defendants that there was an imminent risk that White would drown, only that harm of the same general nature as that which occurred was foreseeable.[9] See Brooks v. Powers , supra, 165 Conn.App. at 67-68, 138 A.3d 1012 ; see also id. ("although a much higher level of risk is needed to establish an imminent harm than to establish a foreseeable harm ... the harm should be defined at the same level of generality in each case" [emphasis omitted] ). Viewing the facts most favorably to the plaintiff, the Appellate Court concluded that a jury reasonably could find that White's drowning was of the same general nature as the risk of harm created by the defendants' conduct and that it would have been apparent to the defendants that the harm was imminent in the sense that it was of such a magnitude that it required immediate action. See id., at 76-77, 138 A.3d 1012. Accordingly, the Appellate Court reversed the judgment of the trial court. Id., at 80, 138 A.3d 1012.
Judge (now Justice) Mullins dissented from the majority opinion. Among other concerns, he disagreed **270 with the majority that White's drowning was of the same general nature as the risk of harm attendant to standing outside during a severe storm. See id., at 90, 138 A.3d 1012 (Mullins , J. , dissenting). Judge Mullins concluded that, "[i]n this case, the plaintiff and the [Appellate Court] majority seem to imply that the dangerous condition was the severe storm on the night of June 18, *376 2008, and that [White] suffered an imminent harm as a result thereof. The fact remains, however, that [White] died on the night of the storm or in the early morning of June 19, 2008, from drowning in Long Island Sound, which was approximately one-half mile from the field in which she was seen during the severe storm. There ... are no facts alleged in the pleadings or presented in the record that tie her drowning to the storm and her presence in the field. She did not drown in the field, nor was she struck by lightning or injured in the field as result of the storm, i.e., struck by a downed tree limb, flying debris, etc.
"Additionally, nothing in the record or in the pleadings indicates that the defendants knew that [White] would accidentally drown after she ventured from the field .... Although the storm may have been a dangerous condition that could have subjected [White] to harm, the zone of such harm is not limitless. The harm suffered must be related to the dangerous condition.... [T]he general risk of harm presented by standing in the middle of a field during a severe storm is too attenuated from the harm that the decedent suffered, which was drowning later that night or the next morning in ... Long Island Sound, approximately one-half mile away from that field. Thus, the nexus between the alleged dangerous condition ... and the imminent harm actually suffered by [White] simply is not there." (Citation omitted; emphasis in original.) Id.
Judge Mullins further concluded that, even if there were a nexus between the storm and White's drowning, **271 the plaintiff's claim would still fail because the plaintiff could not establish that the harm that White suffered was imminent when the defendants were informed about her presence in the field. See id., at 90-92, 138 A.3d 1012 (Mullins , J. , dissenting). "As to imminent harm ... 'the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm.' Haynes v. Middletown , supra, 314 Conn. at 322-23, 101 A.3d 249. Obviously, the harm that [White] suffered ... was her tragic death by drowning in Long Island Sound. [It] cannot [be] ascertain[ed], however, how that harm was imminent when [White] was in the field and the defendants were notified that she needed medical help, or how that imminent harm was or should have been apparent to the defendants." Id., at 90-91, 138 A.3d 1012 (Mullins , J. , dissenting). "The plaintiff's contention that once the defendants failed to respond to [White's] need for medical help, any harm that befell [her] after their failure to act, no matter how attenuated from the dangerous condition, was imminent harm of which the defendants were aware is inconsistent with ... precedent." Id., at 92, 138 A.3d 1012 (Mullins , J. , dissenting).
On appeal to this court following our grant of certification,[10] the defendants urge us to adopt Judge Mullins' reasoning and to conclude that the Appellate Court incorrectly determined both that White's drowning was of the same general nature as the risk of harm created by the storm and that it was imminent within the meaning of the identifiable person, imminent harm exception.
**272 The defendants further *377 contend that, as a matter of law, once they were informed by the 911 dispatcher that another officer would be dispatched to check on White, it could not possibly have been apparent to them that White was at risk of imminent harm or that they themselves-rather than the officer whom they were told would be sent to check on her-had a clear and unequivocal duty to protect White from that harm. The plaintiff, on the other hand, maintains that the Appellate Court correctly determined that a jury reasonably could find that the harm that befell White was foreseeable and so likely to occur that the defendants had a clear and unequivocal duty to take immediate steps to avert it.
We agree with the defendants and Judge Mullins that the Appellate Court incorrectly determined that White's drowning fell within the scope of the risk created by the defendants' failure to immediately investigate the tax collector's report that a woman was standing in a field during the storm, possibly in need of medical attention. Rather, consistent with Judge Mullins' well reasoned dissent, we conclude that White's drowning was far too attenuated from the risk of harm created by the storm for a jury reasonably to conclude that it was storm related, much less imminent in the sense that it was so likely to occur that the defendants had a clear and unequivocal duty to act to prevent it, as the plaintiff was required to prove.
Indeed, it is clear that the plaintiff cannot prevail, even under ordinary negligence principles. To establish a claim of negligence, a plaintiff must demonstrate that the defendant was under a duty of care, that the defendant's conduct breached that duty, and that the breach caused an actual injury to the plaintiff. See, e.g., Doe v. Saint Francis Hospital & Medical Center , supra, 309 Conn. at 174, 72 A.3d 929. The test for whether a legal duty exists is an objective one and seeks to determine, first, "whether an ordinary person in the defendant's position, knowing **273 what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result" and, second, whether, "on the basis of a public policy analysis ... the defendant's responsibility for [his] negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.) Id., at 175, 72 A.3d 929.
The first step in any duty analysis requires a determination of whether the plaintiff's injury was a "reasonably foreseeable" result of the defendant's conduct. Ruiz v. Victory Properties, LLC , 315 Conn. 320, 330, 107 A.3d 381 (2015). Although, typically, this is a question of fact for the jury; see id. ; it becomes an issue of law for the court if "no reasonable fact finder could conclude that the injury was within the foreseeable scope of the risk such that the defendant should have recognized the risk and taken precautions to prevent it.... In other words, foreseeability becomes a conclusion of law ... when ... a fair and reasonable [person] could reach only one conclusion ...." (Citation omitted; internal quotation marks omitted.) Id. Moreover, it is well established that an injury is not reasonably foreseeable as a matter of law when the undisputed facts, considered in the light most favorable to the plaintiff, establish that the connection between the defendant's conduct and the harm suffered by the plaintiff is simply too attenuated. See, e.g., Lodge v. Arett Sales Corp. , 246 Conn. 563, 574-75, 717 A.2d 215 (1998) ; RK Constructors, Inc. v. Fusco Corp. , 231 Conn. 381, 385-86, 650 A.2d 153 (1994). This fundamental negligence principle-which establishes a standard that is indisputably less demanding *378 than the burden on the plaintiff to demonstrate the applicability of the identifiable person, imminent harm exception to discretionary act immunity[11] -is dispositive of the appeal in the present **274 case.[12] As Judge Mullins observed, the zone of harm created by the storm was not without limits, for there are only so many ways in which a person standing in a field during a storm might be injured by the storm. See Brooks v. Powers , supra, 165 Conn.App. at 90, 138 A.3d 1012 (Mullins , J. , dissenting). For example, as Judge Mullins noted, such person may be struck by a downed tree limb, flying debris, or even lightning. Id. Neither the plaintiff nor the Appellate Court has explained, however, and we are unable to ascertain, how drowning in a body of water one-half mile away from the field many hours after she was observed in that field can be included on the list of foreseeable harms under even the broadest or most expansive conception of foreseeability. This may explain why, as Judge Mullins stated, the record is devoid of any facts or allegations tying White's drowning to conditions during the storm or to her presence in the field. Id.
We also agree with the defendants that White's drowning was too attenuated from the risk of harm created by the defendants' conduct for a jury reasonably to conclude that it was imminent. Indeed, even if White's drowning reasonably could be characterized as storm related, it nevertheless strains credulity to conclude that the defendants, in failing to respond to a report of a woman out in a field during a storm-and instead, relaying that report to a 911 dispatcher, albeit in a light- **275 hearted or even flippant manner-ignored a risk that the woman would drown in waters one-half mile away from the field, most likely the next day, after the storm presumably had passed. Indeed, it is no less implausible to believe that that harm was so likely to occur that "the defendant[s] had a clear and unequivocal duty to act immediately to prevent the harm." Haynes v. Middletown , supra, 314 Conn. at 323, 101 A.3d 249. As we explained in Haynes , it is "the magnitude of the risk" that determines whether a harm is imminent. (Emphasis omitted.) Id., at 322, 101 A.3d 249. In the present case, although it may be inadvisable for an adult to stand outside during a severe summer rainstorm, doing so does not pose a risk of such magnitude as to give rise to a clear duty to act immediately to obviate that risk.[13] See id., at 322-23, 101 A.3d 249. *379 Of course, whether harm in any particular case was imminent necessarily is a fact bound question. Thus, under different factual circumstances, an individual's presence in a field during a storm may give rise to a duty on the part of a police officer to take immediate steps to prevent harm to that person. See, e.g., id., at 315 n.7, 101 A.3d 249 ("[a] condition that is not an imminent harm in one context may be an imminent harm in another context"). For example, if White had been a child rather than an adult, the defendants quite likely would have been under a duty to take immediate steps to ensure the child's safety. The facts in the present case, however, are that an adult woman was seen standing in a field **276 during a severe summer rainstorm-unusual behavior, to be sure, but not so obviously dangerous as to give rise to a duty on the part of the defendants to take immediate steps to protect the woman. See id., at 317-18, 101 A.3d 249 ("if a harm is not so likely to happen that it gives rise to a clear duty to correct the dangerous condition creating the risk of harm immediately upon discovering it, the harm is not imminent"). Accordingly, we conclude, contrary to the conclusion of the Appellate Court, that the trial court correctly determined, as a matter of law, that the plaintiff cannot establish that the defendants' conduct falls within the identifiable person, imminent harm exception to governmental immunity.[14]
The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to **277 render judgment affirming the judgment of the trial court.
In this opinion ROGERS, C.J., and McDONALD, ROBINSON and ESPINOSA, Js., concurred.

The town of Westbrook also is a defendant in this action. Because the town's liability is derivative of that of its employees, Powers and Milardo, all references to the defendants are to Powers and Milardo.

As we explain more fully hereinafter, governmental immunity shields municipalities and their employees from liability for negligence when the negligent acts are discretionary rather than ministerial in nature. See, e.g., Haynes v. Middletown , 314 Conn. 303, 312, 101 A.3d 249 (2014). There is an exception to governmental immunity for discretionary acts, however, if a governmental employee fails to act even when it is apparent that an identifiable victim faces imminent harm. See, e.g., id.

After this appeal was filed, we granted the applications of the Connecticut Trial Lawyers Association, the Connecticut Conference of Municipalities and the Connecticut Interlocal Risk Management Agency to file amicus curiae briefs in support of the parties' respective claims.

We further note that the police also interviewed White's next-door neighbor, Patricia Martin, who reported hearing White's apartment door slam twice on the night of June 18, 2008, once at approximately 8 p.m., shortly after the tax collector had observed White standing in the field, and a second time at approximately 10 p.m. Martin was subsequently deposed and testified that the apartments in which she and White resided shared a common wall and that White was the only person in her building who slammed her apartment door upon entering or exiting the building. Martin further stated that, on the evening of June 18, 2008, at approximately 10 p.m., she had just gotten into bed when the door to White's apartment was slammed so hard that the wall between their two apartments vibrated, startling Martin.

General Statutes § 52-557n (a) provides: "(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit; and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance; provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149. (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."

As we have explained, "[m]unicipal officials are immune from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society.... Therefore, [d]iscretionary act immunity reflects a value judgment that-despite injury to a member of the public-the broader interest in having government officials and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.... In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion." (Citations omitted; footnote omitted; internal quotations marks omitted.) Coley v. Hartford , supra, 312 Conn. at 161-62, 95 A.3d 480.

In the trial court, the plaintiff asserted that the acts of the defendants were ministerial and, therefore, not subject to immunity. The trial court rejected that claim, however, and the plaintiff has not challenged that ruling on appeal.

In addition to Doe v. Petersen , supra, 279 Conn. at 620-21, 903 A.2d 191, this court has characterized the identifiable victim, imminent harm exception as requiring proof of the apparentness of the specific harm that befell the plaintiff on at least three separate occasions. See St. Pierre v. Plainfield , 326 Conn. 420, 436, 165 A.3d 148 (2017) ; Grady v. Somers , 294 Conn. 324, 353-54, 984 A.2d 684 (2009) ; Cotto v. Board of Education , 294 Conn. 265, 276, 984 A.2d 58 (2009).

The Appellate Court also reasoned that, in those cases in which this court has used the word "specific" to delimit the term "imminent harm" for purposes of the identifiable person, imminent harm exception, "the specificity of the harm played no role in [this] court's analysis, and the court gave no indication that by including the word 'specific' in one sentence it intended to overrule the prior consensus-at least in duty of care cases, to which the court has likened immunity cases-that the general nature of the harm is what matters." Brooks v. Powers , supra, 165 Conn.App. at 69, 138 A.3d 1012.

Our grant of certification to appeal was limited to the following issue: "Did the Appellate Court use the correct standard for determining whether the 'harm' was imminent, and properly apply the identifiable victim, imminent harm standard to the facts of this case, in determining that the trial court improperly granted summary judgment in favor of the defendants?" Brooks v. Powers , 322 Conn. 907, 143 A.3d 603 (2016).

See, e.g., Haynes v. Middletown , supra, 314 Conn. at 321, 101 A.3d 249 (contrasting "demanding imminent harm standard" with ordinary negligence standard); Edgerton v. Clinton , 311 Conn. 217, 228 n.10, 86 A.3d 437 (2014) ("[i]mposing liability when a municipal officer deviated from an ordinary negligence standard of care would render a municipality's liability under § 52-557n no different from what it would be under ordinary negligence"); Brooks v. Powers , supra, 165 Conn.App. at 68, 138 A.3d 1012 (explaining that significantly higher degree of risk is needed to establish imminent harm than to establish foreseeable harm in ordinary negligence case).

In light of this conclusion, we have no occasion to revisit our prior cases characterizing the identifiable person, imminent harm exception as requiring a showing that the specific harm that that the identifiable person imminently faced is the harm that actually occurred. Suffice it to say that the Appellate Court's contrary determination finds little if any support in this court's relevant precedent.

It bears mention, moreover, that uncontroverted evidence indicates that White made it safely out of the field after being observed there between 7:30 and 8 p.m.-her next-door neighbor twice heard White slam her front door between 8 and 10 p.m. that evening, and, as the trial court noted, the unchallenged evidence established her time of death at between 7 and 10 a.m. the next morning. See footnote 4 of this opinion. The fact that she was able to make her way home after leaving the field cannot be squared with a finding that her standing in the field during the storm was "so dangerous that it merit[ed] an immediate response." Brooks v. Powers , supra, 165 Conn.App. at 71, 138 A.3d 1012, citing Haynes v. Middletown , supra, 314 Conn. at 325, 101 A.3d 249.

Asserting that "the legislature intends for police officers to be the first line of defense when helping people with mental illness who could be dangerous to themselves or [to] others," the dissenting justice contends that the trial court should not have granted the defendants' motion for summary judgment because, in light of White's conduct, there existed a "reasonable likelihood" that "she could [have been] trying to hurt herself" due to a mental illness, and that such a risk should have been apparent to the defendants. According to the dissenting justice, it is that risk, and not the risk that she would be harmed by the storm, that should be our focus for purposes of this appeal. The plaintiff, however, has never even attempted to explain how the evidence demonstrates, first, that it should have been obvious to the defendants that White suffered from a serious mental illness and, second, that such mental illness gave rise to an imminent risk of self-inflicted harm. Indeed, we do not see how the plaintiff could have prevailed on that claim if she had made it, which she did not. With respect to defeating the defendants' governmental immunity, it is undisputed that the plaintiff's claim-as advanced in the trial court, in the Appellate Court and in this court-consistently has been that the defendants should have been aware that White was exposed to a serious risk of harm from the storm . For that reason alone, it would improper for us to entertain the claim that the dissenting justice raises for the first time in this certified appeal. See, e.g., White v. Mazda Motor of America, Inc. , 313 Conn. 610, 632, 99 A.3d 1079 (2014) (unfair to consider claim when defendants "had no meaningful chance to discover facts related to, and [to] make a record to defend against, an entirely different theory of liability"); State v. Fauci , 282 Conn. 23, 26 n.1, 917 A.2d 978 (2007) (in certified appeal, "[w]e ordinarily decline to consider claims that [were] not raised properly before the Appellate Court").